**Charles Sherman LITTLE, et al., Plaintiffs,**

v.

**PURDUE PHARMA, L.P., et al., Defendants.**

**Case No. C–3–01–344.**

United States District Court, S.D. Ohio, Western Division.

Sept. 20, 2002.

James Edwin Swaim, Flanagan Lieberman Hoffman & Swaim, Dayton, OH, Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Charles David Ewing, Gardner, Ewing & Souza, Gary L. Gardner, Damon B. Willis, Gardner Ewing & Souza, Louisville, KY, for plaintiffs.

Phillip Jude Smith, David Stewart Cupps, Vorys Sater Seymour & Pease, Columbus, OH, Daniel Jerome Buckley, Vorys Sater Seymour & Pease, Cincinnati, OH, Paul Farrell Strain, Venable, Baetjer & Howard, Baltimore, MD, Joseph P.

Thomas, Ulmer & Berne, Cincinnati, OH, Milton King Hill, III, Venable Baetjer & Howard LLP, Towson, MD, Kenneth A. Cohen, Kathleen Luz, U. Gwyn Williams, Goodwin Procter & Hoar, Boston, MA, Timothy T. Reid, Reid Berry & Stanard, Cleveland, OH, Robert Louis Berry, Reid Berry Marshall & Wargo, Columbus, OH, Stephen Vincent Freeze, Freund Freeze & Arnold, Thomas M. Kollin, Dayton, OH, for defendants.

## DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION TO REMAND (DOC. # 16); TERMINATION ENTRY

RICE, Chief Judge.

Plaintiffs are Charles Sherman Little, Peggy Sue Lowell, and Lyneia Ann Marcum (collectively, "Plaintiffs"). Before the Court is their Motion to Remand (Doc. # 16). Defendants are Purdue Pharma, L.P., Purdue Pharma, Inc., Purdue Frederick Co., Purdue Pharmaceuticals, L.P., Abbott Laboratories, Abbott Laboratories, Inc., The P.F. Laboratories, Inc., PRA Holdings, Inc., and Partners Against Pain (collectively, "corporate Defendants"), and CVS[1] and the Medicine Shoppe[2] (collectively, "local Defendants"). Plaintiffs filed a class action suit against the corporate and local Defendants in the Court of Common Pleas of Montgomery County, Ohio. Defendants subsequently removed the action to this Court (see Doc. # 1), pursuant to 28 U.S.C. § 1441, on the basis that all of them are diverse from Plaintiffs with the exception of local Defendants, and that local Defendants have been "fraudulently joined" and, therefore, should not be considered by the Court for purposes of making a diversity finding. Defendants also submit that removal is proper because Plaintiffs' First Amended Class Action Complaint (attached to Doc. # 1)("Amended Complaint") states a federal cause of action.

Pursuant to 28 U.S.C. § 1447, Plaintiffs move to remand, contending that local Defendants have not been fraudulently joined and that their Amended Complaint states a "colorable" cause of action against them. Plaintiffs also contend that their Amended Complaint raises questions of Ohio law only.[3]

### I. Claims Raised in the Complaint

Plaintiffs allege that they have "suffered from exposure to the dangers of OxyContin" (Amended Compl. ¶ 67), a prescription drug, sold in tablet form, manufactured and/or distributed and/or sold by the various Defendants. As a result, they sought relief in state court on several grounds, contending that Defendants engaged in "wrongful conduct and unlawful practices" in the manufacturing, marketing, promotion, sale, and distribution of OxyContin. (Id. ¶ 2.) They also allege that Defendants "misrepresented" OxyContin to the public, and failed to warn the public of its "appropriate uses, risks[,] and safety" (id.

---

**1.** Defendants state that the proper name for this Defendant is Revco Discount Drug Centers, Inc. ("Revco"). (Purdue Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Remand (Doc. # 23) at 3; Defendants Revco Discount Drug Centers, Inc.'s and Lucas Enterprises, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion to Remand (Doc. # 22) at (unnumbered) 2.) The Court will refer to Defendant as such when necessary.

**2.** Again, Defendants state that this Defendant was wrongly named, and should be referred to as Lucas Enterprises, Inc. ("Lucas"). The Court will refer to Defendant as such when necessary.

**3.** Plaintiffs also proffer an argument that Defendants' Notice of Removal was procedurally defective. (Doc. # 16 at 17.) Finding the Plaintiffs' other arguments persuasive, the Court need not address this issue.

¶ 4), all of which has led to the drug's overprescription and the consequential addiction, physical and emotional harm, death, and social problems, suffered by Plaintiffs and the public in general. (*Id.* ¶¶ 5–10.)

The pleadings are general in their nature; the specifics few. One of the more particularized allegations is that Purdue Pharma, L.P., issued a misleading advertisement on the benefits of OxyContin which the Food and Drug Administration ("FDA") had to ask it to discontinue. (*Id.* ¶ 52.) Plaintiffs also allege that Defendants used "coercive and seductive" tactics to influence doctors and pharmacists to prescribe or sell the drug (*id.* ¶¶ 51, 53–54), but details are not provided. Perhaps the most detailed allegation is that Defendants failed to integrate a mechanism into OxyContin which would prevent its time-release feature [4] from being circumvented, the result of such omission being that users may access the full potency of a single tablet in a shorter period of time than intended. (*Id.* ¶ 58.) It is alleged that "numerous" deaths have resulted in Montgomery County, Ohio, and other Ohio counties, from the use of OxyContin. (*Id.* ¶ 65.) While no mention is made in these background pleadings of any relations of Plaintiffs who have died from the use of OxyContin, subsequent pleadings included within the enumerated counts make reference to "Plaintiff's decedent." (*Id.* ¶¶ 97, 98, 103–105, 110, 113, 115, and 133–135.) These references are to "Plaintiff" in the singular, but it is entirely unclear which Plaintiff that is, or who the decedent is, as no mention is made of him or her in the background pleadings. As a final point, it has not been alleged specifically that local Defendants were the suppliers of OxyContin to Plaintiffs.

Based on these underlying facts, Plaintiffs set forth the following counts: (1) strict product liability; (2) negligence; (3) breach of express warranty; (4) breach of implied warranty; (5) violation of Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq.;* (6) fraud; and (7) unjust enrichment. Additionally, they seek damages and a host of court-supervised equitable relief.[5]

Although not controlling for any preclusive purposes, the Court notes several recent decisions involving the same corporate Defendants and factually similar claims. In *McCallister v. Purdue Pharma L.P.,* 164 F.Supp.2d 783 (S.D.W.Va.2001), defendants therein removed on federal question grounds and the court sustained the plaintiffs' motion for remand, finding that the state causes of action could not be interpreted as stating federal claims. A

---

4. By "time-release" feature, it is meant an internal mechanism which controls the pace at which the drug's active ingredient is released after ingestion. The inclusion of such in the drug allows a user to rely on fewer doses, each dose containing greater concentration of the active ingredient to begin with.

5. In particular, Plaintiffs seek the following: (1) restitution of any profits Defendants have realized on account of the sale of OxyContin; (2) compensatory damages for injuries; (3) punitive damages; (4) establishment of an OxyContin rehabilitation facility in Ohio; (5) establishment of a court-supervised fund to help treat victims of OxyContin abuse, and to be used for (a) notifying potential OxyContin users of its dangers, (b) aiding the early diagnosis and treatment of OxyContin-induced injuries, (c) research into the effects of, and cures for, OxyContin use and abuse, (d) accumulating demographic information on OxyContin victims, (e) developing a database storing the demographic information, and (f) facilitating a communication network between physicians treating OxyContin victims; (6) an order requiring Defendants to fund and institute a general awareness campaign addressing the dangers of OxyContin; (7) costs, fees, expenses, and pre- and post-judgment interest; (8) establishment of a general drug abuse rehabilitation center, available to all Ohioans free of charge. (*See* Compl. ("Prayer for Relief") at 30–32.)

similar result was obtained in *Ohler v. Purdue Pharma, L.P.*, 2002 WL 88945 (E.D.La. Jan. 22, 2002), where the District Court for the Eastern District of Louisiana granted the plaintiff's motion to remand, having found the defendants' argument that a local physician had been fraudulently joined to be without merit. *Ohler* was then followed by the same court, leading to the same result, in *Catalano v. Cleggett–Lucas*, 2002 WL 506810 (E.D.La. March 28, 2002) and *Hale v. Jarrot*, 2002 WL 545339 (E.D.La. April 9, 2002). In *Salisbury v. Purdue Pharma, L.P.*, 166 F.Supp.2d 546 (E.D.Ky.2001), defendants therein met with better luck, the court finding that removal on the basis of diversity by virtue of fraudulent joinder was appropriate given its finding that plaintiffs had no basis of recovery against pharmacy defendants under state law. The identical result was reached in *Baker v. Purdue Pharma L.P.*, Civil Action No. 1:01–0553 (S.D.W.Va. March 28, 2002), wherein it was held that a West Virginia statute precluded plaintiffs from bringing their suit, which included claims of negligence and breach of warranties, against pharmacy defendants.[6]

## II. *Motion to Remand*

If Defendants are not correct in their argument that there is either complete diversity or the existence of a federal claim, then the suit must be remanded. Local Defendants filed a brief addressing the merits of Plaintiffs' state law claims against them, in which they argue that they have been fraudulently joined. (*See* Doc. 22.) The various "Purdue" Defendants filed a brief that reiterates the points made in the local Defendants' brief, and further argues that Plaintiffs' claims are wholly federal in nature. (*See* Doc. # 23.) The various "Abbott" Defendants filed a brief in which they argue that the corporate Defendants are, in effect, federal officers by virtue of the regulatory scheme which limits their independence from federal oversight, and that any suit against them is therefore removable on that basis. (*See* Doc. # 24.) The Court will consider the arguments in turn.

### A. *Diversity of Local Defendants*

■ The Court will first take up the question of what is the proper analytical standard in addressing a charge of fraudulent joinder. Following that, the Court will address the underlying facts giving rise to the question.[7]

### 1. *Defining the Fraudulent Joinder Analysis*

■ The question presented is whether local Defendants have been fraudulently

---

6. The Baker court also stated that a finding of fraudulent joinder would have been warranted even in the absence of the state statute. In doing so, the court adopted a rationale set forth in *In re Rezulin Products Liability Litigation*, 133 F.Supp.2d 272 (S.D.N.Y.2001). For reasons which shall be discussed herein, the Court does not find the rationale of *Rezulin*, and likewise that of Baker, to be persuasive.

7. Parenthetically, the Court notes that Defendants have failed to show adequate proof of their diversity irrespective of the fraudulent joinder issue. Two of the corporate Defendants, Purdue Pharma, L.P., and Purdue Pharmaceuticals, L.P., are, in fact, limited partnerships. (*See* Doc. # 1 at ¶ 4(c)(1) &

(4).) These particular Defendants have submitted the residency status of their common general partner, Purdue Pharma, Inc., but have not submitted the residency status of their other partners. Of course, in assuming diversity jurisdiction in which partnerships are nominal parties, a federal court must take consideration of the residency status of each partner, general, limited, or otherwise. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). For the present, Defendants' oversight is immaterial because the Court finds that Plaintiffs have pled a colorable claim against local Defendants, thus defeating diversity.

joined. "Under the doctrine of fraudulent joinder, the inquiry is whether [Plaintiffs have] at least a colorable cause of action against [local Defendants] in the [Ohio] state courts." *Jerome–Duncan, Inc. v. Auto–By–Tel, L.L.C.,* 176 F.3d 904, 907 (6th Cir.1999)(citing *Alexander v. Electronic Data Systems Corp.,* 13 F.3d 940, 949 (6th Cir.1994)). As the *Alexander* court explained, "[t]here can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged or on the facts in view of the law." 13 F.3d at 949 (quoting *Bobby Jones Garden Apartments, Inc. v. Suleski,* 391 F.2d 172, 176 (5th Cir. 1968)). The court further elaborated, restating the question as "whether there was any 'reasonable basis for predicting that the plaintiff could prevail.'" *Id.* (quoting *Tedder v. F.M.C. Corp.,* 590 F.2d 115, 117 (5th Cir.1979)). The burden is on Defendants to show joinder was fraudulent, *see Jerome–Duncan,* 176 F.3d at 907, and that burden is a heavy one. *See Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir. 1992). Furthermore, " 'any disputed questions of fact and ambiguities in the controlling state law should be resolved in favor of the non-removing party.'" *Alexander,* 13 F.3d at 949 (quoting *Carriere v. Sears, Roebuck & Co.,* 893 F.2d 98, 100 (5th Cir. 1990)); *see also Coyne v. American Tobacco Co.,* 183 F.3d 488, 493 (6th Cir.1999).

Thus, the Court must construe disputed facts and competing inferences in favor of Plaintiffs. After so doing, if it is found that any of Plaintiffs' counts present a colorable cause of action against local Defendants, then diversity does not exist, and the captioned cause must be remanded. This analysis is not unlike that related to a dismissal motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"). Pursuant thereto, "[a] court should not dismiss a plaintiff's complaint ... unless, after construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, the court determines that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Nelson v. Miller,* 170 F.3d 641, 649 (6th Cir.1999) (citation omitted); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The Ohio standard is identical. *See O'Brien v. University Community Tenants Union,* 42 Ohio St.2d 242, 327 N.E.2d 753 (1975).

Of course, whereas a dismissal pursuant to Rule 12(b)(6) is on the merits, denying a motion to remand on the basis of fraudulent joinder is purely a procedural decision which allows the federal court to take diversity jurisdiction over the diverse defendants,[8] but despite this difference, the un-

---

**8.** The irony of denying a motion to remand on the basis of fraudulent joinder is that it is not tantamount in itself to a motion to dismiss with respect to the non-diverse defendants. Thus, the non-diverse defendants remain in the case even though the federal court lacks diversity jurisdiction over them (assuming the complaint does not state a federal question, a fact which would provide an entirely independent basis to deny the motion to remand). The Fifth Circuit has taken note of the irony of a federal court assuming jurisdiction over an individual over which it has no jurisdiction, and subsequently dismissing the claim against him pursuant to Rule 12(b)(6), despite

not having the jurisdiction to do so. *See Suleski,* 391 F.2d at 174. Given the lack of diversity, the proper ground to dismiss would seem to be Rule 12(b)(1), for lack of subject matter jurisdiction. In this way, it should have no preclusive effect on the plaintiff's ability to bring a subsequent suit against the non-diverse defendants back in state court. Of course, if the federal court is correct in its assessment of the plaintiff's chances of success on the state-law claim against the non-diverse defendants, presumably any subsequent state action against the non-diverse party based on identical pleadings would be dismissed, not on the basis of *res judicata,* but on

derlying inquiries are much alike. It has been noted by the Third Circuit, however, that "the inquiry into the validity of a complaint triggered by a motion to dismiss under Rule 12(b)(6) is more searching than that permissible when a party makes a claim of fraudulent joinder." *Batoff*, 977 F.2d at 852. Citing *Batoff*, the Fourth Circuit has stated that this means that a plaintiff gets more favorable treatment in a fraudulent joinder inquiry than she does in a 12(b)(6) inquiry. *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999). The *Batoff* court held that a fraudulent joinder basis for removal (or for opposing remand) should only be upheld if it is found that plaintiff's complaint against the non-diverse defendants is "wholly insubstantial and frivolous." 977 F.2d at 852. It concluded that a plaintiff could thereby present a "colorable" claim, and enjoy remand to state court, even if such were ultimately dismissed in the state court for a "failure to state a claim" pursuant to the state equivalent of a Rule 12(b)(6) motion.

 Although "frivolous" and "lack of reasonableness" (or "unreasonable") do not mean the same thing literally, the difference in this context would appear more semantic than substantive, and the Court finds that the Sixth Circuit's "no reasonable basis" standard is essentially the same as the "wholly insubstantial and frivolous" standard of the Third and Fourth Circuits.[9] Furthermore, having considered the matter, the Court agrees with the Third and Fourth Circuits that the benefit of the doubt given a plaintiff as part of the fraudulent joinder inquiry should be more deferential than even that given under Rule 12(b)(6).[10] The Court recognizes that determining where the line between "deferential" and "even more deferential" should be drawn might be viewed as a purely academic exercise.[11] Nevertheless, the Court is of the opinion that determining the difference is more than academic, given the collateral effects that the results of the respective inquiries render. By labeling a claim "unreasonable" or "wholly insubstantial" or "frivolous," the plaintiff's, and possibly her attorney's, ethics in filing the suit are drawn into question. *See, e.g.*, Ohio R. Civ. P. 11. A dismissal under Rule 12(b)(6) should not connote a finding of frivolousness or unreasonableness on its own. Thus, whereas a Rule 12(b)(6) dismissal connotes that a plaintiff's claim has no basis in law, a decision overruling a motion for remand where the defendant is claiming fraudulent joinder connotes that a

the basis that, as the federal court had previously held, no recovery would be possible against that defendant based on the facts as pled in the complaint.

9. *Cf. Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir.1998)(holding that "the defendant [seeking removal] must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is *no possibility*, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court")(emphasis added). At least one district court within the Second Circuit has construed this language to mean only that remand should be granted if there is "no rea-

sonable basis" for predicting liability on the claims. *See In re Rezulin Products Liability Litigation*, 133 F.Supp.2d 272, 280, n. 4 (S.D.N.Y.2001).

10. *Cf. Ohio v. Wright*, 992 F.2d 616, 625, n. 1 (6th Cir.1993)(Nelson, J., concurring)(discussing the difference between "colorable" and "valid" with respect to a federal defense serving as a basis for removal under 28 U.S.C. § 1442).

11. *Cf. id.* (pointing out that "[o]ne could argue, to be sure, that the distinction between a colorable defense and a valid defense disappears where there is no dispute as to the facts").

plaintiff's claim, as to the non-diverse defendant, has no basis in law or reason.

In addressing the underlying Complaint as filed in the Common Pleas Court, this Court will scrutinize the face of the Complaint only to the extent it must to determine whether there is any reasonable basis to predict that Plaintiffs could prevail in the Common Pleas Court against the local Defendants in the absence of an effective defense. Only if the claims against the local Defendants are found to be unreasonable or frivolous will the Court deny Plaintiffs' Motion for Remand.

### 2. Analysis

■ Local Defendants, Revco and Lucas, assert that Plaintiffs have failed to allege in their Amended Complaint any facts showing a causal link between their injuries and local Defendants' actions. (Doc. # 22 at (unnumbered) 4.) This argument seems to be directed toward a technical deficiency of the Amended Complaint. Given the heightened benefit of the doubt due plaintiffs in a fraudulent joinder analysis, it seems to this Court that whether a claim is "colorable" should turn on whether there is a basis for it in

law, and that whether there is a basis for it in fact is a question more appropriately left for the court which ultimately takes control of the case.[12] In any event, under Ohio's "Rule Pleading" system, *see* Ohio R. Civ. P. 8(A) & related Staff Note,[13] the Court finds that a causal link between Plaintiffs' purported injuries and the local Defendants' actions has been pled in adequate fashion. In paragraph 63 of their Amended Complaint, Plaintiffs state that "Pharmacy Defendants inappropriately distributed and recommended OxyContin to residents of Montgomery County, Ohio." Then, at paragraph 67, Plaintiffs state:

> The citizens of Ohio, including the named Plaintiffs, ..., have suffered from exposure to the dangers of Oxy-Contin *as a result of the negligence, intentional acts, and indifference of the Defendants.* Moreover, the Defendants' collective misrepresentations prevented the named Plaintiffs ... from learning the dangers of OxyContin ....

(Emphasis added.) Thus, Plaintiffs have alleged that local Defendants' acts of "distributing," "recommending," and "misrepresenting" OxyContin led to their exposure

---

**12.** A pleading deficiency, though not to be taken lightly, is potentially correctable with leave of the court to amend. For example, in *Peterson v. Teodosio*, 34 Ohio St.2d 161, 297 N.E.2d 113, 122 (1973), the Ohio Supreme Court found that the trial court properly sustained a motion for judgment on the pleadings where the claim appeared on the face of the complaint to violate the statute of frauds. Nevertheless, finding also that the "spirit" of the Ohio Civil Rules was to have cases tried on their merits, the Ohio Supreme Court concluded that the trial court committed prejudicial error in not sustaining plaintiff's motion for leave to amend the deficient pleadings, which had been filed promptly after the court's entry of judgment on the pleadings. *Id.* Given that a federal court deciding a motion to remand must consider only the complaint as it was filed in the state court, and is not in a position to allow the plaintiff to

correct a mistake or oversight in the pleadings, and in light of the heavy burden on defendants to show the non-diverse defendants were fraudulently joined, it seems to this Court that a finding of fraudulent joinder should not be based on factual deficiencies within the pleadings which are correctable by amendment.

**13.** The Staff Note to Rule 8(A) makes clear that the Ohio rule emulates Federal Rule 8(a). The Supreme Court has noted that "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

to its dangers. Discovery will reveal whether these assertions are true; the causal connection as pled is substantial enough for the present.

The greater question for the Court is whether local Defendants are amenable to suit under any of the claims pled in the Amended Complaint. If the Court finds local Defendants properly joined to just one of them, then diversity does not exist.

As developed at common law, strict liability for a defective product extended to any seller in the business of selling the product, be it the manufacturer or a subsequent seller, such as a wholesaler or retailer. *See* Restatement (Second) of Torts § 402A, cmt. *f.* The general premise of Defendants' argument is that pharmacies are merely inert middlemen: they are the processing conduit through which a physician bestows pharmaceutical treatment upon a patient, and nothing more. That being the case, Defendants argue, Ohio would not recognize any of Plaintiffs' claims as they apply to local Defendants because they all contemplate some form of proximate causal link between the manufacture and prescribing of OxyContin on the front end and Plaintiffs' injuries on the back end. As Defendants view it, Plaintiffs' entire action against local Defendants rests on the existence of a pharmacy's "duty to warn" prescription drug purchasers of any dangers inherent in the use of the drug. Because of a pharmacy's role as an innocuous middleman in the distribution process, such a duty, Defendants insist, does not exist.

█ In support of their argument that local Defendants owed no duty to warn, Defendants point to "settled national law" as establishing the rule that pharmacies do not owe a duty to warn consumers of potential dangers inherent to their prescribed drugs. They also invoke the "learned intermediary rule," a doctrinal

rule, recognized by the Ohio Supreme Court, which shifts the manufacturer's burden of liability for manufacturing a harmful drug to the consumer's prescribing physician, provided a finding that the manufacturer had given adequate notice to the physician of the drug's effects. *See Tracy v. Merrell Dow Pharmaceuticals,* 58 Ohio St.3d 147, 569 N.E.2d 875, 878 (1991); *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). The rule is based on Comment *k* to § 402A of the Second Restatement, which concerns strict product liability. Comment *k* recognizes that some products, including prescription drugs, are inherently dangerous, such that the liability to which their sellers can be subject should be limited.

> The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for the unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

"The rationale behind [this rule] is that the physician stands between the manufacturer and the patient as a learned intermediary. The physician has the duty to know the patient's condition as well as the qualities and characteristics of the drugs or products to be prescribed for the patient's use. The physician is in the best position, therefore, to balance the needs of the patients against the risks and benefits of a particular drug or therapy, and then to supervise its use." *Tracy,* 569 N.E.2d at 878 (citation omitted).

█ In Ohio, "[i]n order to recover in an action for products liability based upon negligence, a plaintiff must show that the defendant owed him a duty, that the duty

was breached and that the injury proximately resulted from the breach." *Freas v. Prater Constr. Corp., Inc.,* 60 Ohio St.3d 6, 573 N.E.2d 27, 30 (1991) (citation omitted). No Ohio appellate court has considered whether pharmacies may be held liable for failing to warn about potential dangers that attend the consumption of a particular prescribed drug. However, building upon the logic underlying the learned intermediary rule, many other courts have held that pharmacies cannot be held liable. *See In re Rezulin Products Liability Litigation,* 133 F.Supp.2d 272, 288–89 nn. 53, 55 (S.D.N.Y.2001)(citing cases, and finding that "[a]lmost every other state confronted with the question has declined to impose on pharmacies a duty to warn of intrinsic dangers of prescription drugs" because to do so would be to undermine the physician's learned judgment and relationship to her patients). Defendants contend that there is no doubt that Ohio courts would rule in the same way were the issue to be presented.

■ First, it must be noted that Defendants are arguing on two fronts. The "no duty to warn" argument goes toward Plaintiff's negligence claim. It is ineffective against the strict liability claim given that strict liability is concerned with neither fault nor duty. *See* § 402A, cmt. *a* (noting that the fact that defendant used "all possible care in the preparation and sale of the product" is no defense). Nevertheless, in arguing that the learned intermediary rule should be adapted to shield pharmacies from any liability, Defendants are also attacking on the strict

liability front. The two claims are easy to confuse, as strict liability and negligence theories both inherently underlie product liability claims. *See Carrel v. Allied Products Corp.,* 78 Ohio St.3d 284, 677 N.E.2d 795, 798, n. 1 (1997).

■ Addressing the general argument, the Court's first reaction is that given the fact that this presents a case of first impression in the courts of Ohio, a federal court should be wary of divesting the state courts of the first opportunity to rule on the matter. The *Rezulin* court, having taken ownership of sixteen separate actions by virtue of a consolidation order from the Judicial Panel on Multidistrict Litigation, held, as a matter of first impression in Mississippi, and without the benefit of a high court ruling in the States of Alabama, Louisiana, and Texas, that it is settled that a pharmacy owes no duty to warn prescription drug consumers of inherent dangers.[14] 133 F.Supp.2d at 290–94. In light of the Court's discussion, *supra,* concerning the more deferential level of scrutiny to be given in a fraudulent joinder analysis as compared to a Rule 12(b)(6) analysis, this Court shall decline to hypothesize how Ohio would rule on this issue. Defendants' reasoning that Ohio courts would dismiss the claims against local Defendants is quite logical, but be that as it may, a federal court should hesitate before pronouncing a state claim frivolous, unreasonable, and not even colorable in an area yet untouched by the state courts. *Cf. Colonial Properties, Inc. v. Vogue Cleaners, Inc.,* 77 F.3d 384, 386 (11th Cir.1996).[15] In a Rule 12(b)(6) set-

14. Remand with respect to certain West Virginia claims was denied pursuant to state statute. 133 F.Supp.2d at 294. (The same statute was at the heart of the decision in *Baker, supra.*) With respect to the Mississippi cases, the court held in the alternative that plaintiff's claims "failed to state a claim" for

the failure to warn and breach of implied warranty claims, seemingly applying a Rule 12(b)(6) analysis. *Id.* at 290–92.

15. The district court in *Colonial Properties* had taken supplemental jurisdiction over a claim of trespass arising under the common

ting, the Court would be more pressed to predict how Ohio courts would rule on the merits; determining whether a claim is merely colorable, for purposes of ruling on a motion to remand, does not require the Court to go as far.

The Court also has a second reason to leave the question to the Ohio courts, other than mere comity. As noted above, with more or less a single argument, Defendants are arguing on two fronts, attacking both the strict liability claim and the negligence claim by invoking the learned intermediary rule. However, the learned intermediary rule, as has been pointed out, has its origins in Comment *k* to § 402A. It is questionable, at least to this Court, whether the doctrine which has arisen around this comment, shielding manufacturers from *strict liability* as long as they provide ample warnings to physicians of the drug's characteristics, is correctly applied to the *negligent* acts of pharmacies. That is to say, even if it is logical that local Defendants should not be held strictly liable given that corporate Defendants cannot, it is not obvious that the rule addresses negligence claims arising out of the same nucleus of facts.[16] The *Rezulin* court did not address this distinction,[17] and this Court shall leave it to the Ohio courts to consider. *Cf. King v. Warner–Lambert Co.*, 2002 WL 988167, at *2 (D.Nev. May 7, 2002) (rejecting defendants' argument that the learned intermediary rule foreclosed plaintiff's strict liability suit against a pharmacist as a matter of Nevada law).

■ Defendants further argue that the product liability claims are barred by Ohio Rev.Code § 2307.78, part of the Ohio Products Liability Act ("OPLA"), §§ 2307.71–2307.80. Section 2307.78 governs product liability claims against "suppliers" of products. Pharmacies are "sup-

---

law of Alabama. In reversing the district court's ruling that a landlord could bring an action for trespass of a common area against his tenant, the Eleventh Circuit noted that the district court had relied upon a Missouri Court of Appeals case for persuasive authority on how Alabama courts would rule, Alabama itself having never addressed the issue. 77 F.3d at 386. The court stated:

> While the district court may have been entirely correct in its prediction that the Alabama courts would follow the reasoning of [the Missouri Court of Appeals] if confronted with the issue, the fact remains that this is a case of first impression under Alabama law. Rather than speculating about how the Alabama courts would answer this question, we prefer to certify the issue for resolution by the Alabama Supreme Court. As we have recently said, "Where there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary *Erie* 'guesses' and to offer the state court the opportunity to interpret or change existing law."

*Id.* at 387 (citation and internal footnote omitted).

16. For example, if the facts showed that a pharmacy was aware of recently reported harmful side effects, it is reasonable to think that pharmacies might be held to a duty to post an advisory, given that they are in a better position than physicians to warn about such dangers of which a customer may not have had opportunity to be informed since her last medical appointment. It is also reasonable to conceive that liability might exist if a pharmacy continued to sell to the public a drug which it was aware was having ultra-deleterious effects on users, or if it offered faulty information in response to a customer's query.

17. The court did note that "states have not limited their holdings to failure to warn claims, but have shielded pharmacists from liability on theories of strict liability and breach of warranty as well," 133 F.Supp.2d at 289, but this observation recharacterizes the rule and ignores its very foundation: the learned intermediary rule is *an exception to strict liability,* so the fact that the rule should apply in the strict liability context is evident. Its application in the negligence context is what appears questionable to this Court.

pliers" within the meaning of the statute, as that term is defined at § 2307.71(O).[18] Paraphrasing § 2307.78(B),[19] Defendants argue that product liability claims against suppliers will lie only where: (1) the consumer is unable to obtain relief from the manufacturer directly, either because the manufacturer is unavailable or insolvent or the supplier is unwilling to identify the manufacturer in a timely manner; (2) the supplier is either owned by or owns the manufacturer; or (3) the supplier exerts some type of control over the product (such as manufacturing, design, or marketing) or alters the product in some way before it reaches the consumer. (Doc. # 22 at (unnumbered) 18.)

The flaw with their reliance on this provision is that division (B) only governs when a supplier may be held liable for the acts of the manufacturer; it does not concern the liability of a supplier *qua* supplier. By comparison, division (A), which they do not address, makes it clear that suppliers of products can be held liable for their own negligence ((A)(1)), or be held strictly liable for their own false representations ((A)(2)), in the event such negligence or false representation, concerning the product in question, causes the consumer harm.

**18.** This provision states:

(1) "Supplier" means, subject to [division 2] of this section, either of the following:

(a) A person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce;

(b) A person that, in the course of a business conducted for the purpose, installs, repairs, or maintains any aspect of a product that allegedly causes harm.

(2) "Supplier" does not include any of the following:

(a) A manufacturer;

(b) A seller of real property;

(c) A provider of professional services who, incidental to a professional transaction the essence of which is the furnishing of judgment, skill, or services, sells or uses a product;

(d) Any person who acts only in a financial capacity with respect to the sale of a product, or who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor.

**19.** Division (B) states:

A supplier of a product is subject to liability for compensatory damages based on a product liability claim under sections 2307.71 to 2307.77 of the Revised Code, *as if it were the manufacturer of that product,* if the manufacturer of that product is or would be subject to liability for compensatory damages based on a product liability claim under sections 2307.71 to 2307.77 of the Revised Code and any of the following applies:

(1) The manufacturer of that product is not subject to judicial process in this state;

(2) The claimant will be unable to enforce a judgment against the manufacturer of that product due to actual or asserted insolvency of the manufacturer;

(3) The supplier in question owns or, when it supplied that product, owned, in whole or in part, the manufacturer of that product;

(4) The supplier in question is owned or, when it supplied that product, was owned, in whole or in part, by the manufacturer of that product;

(5) The supplier in question created or furnished a manufacturer with the design or formulation that was used to produce, create, make, construct, assemble, or rebuild that product or a component of that product;

(6) The supplier in question altered, modified, or failed to maintain that product after it came into the possession of, and before it left the possession of, the supplier in question, and the alteration, modification, or failure to maintain that product rendered it defective;

(7) The supplier in question marketed that product under its own label or trade name;

(8) The supplier in question failed to respond timely and reasonably to a written request by or on behalf of the claimant to disclose to the claimant the name and address of the manufacturer of that product.
(Emphasis added.)

What is more, the Ohio Supreme Court has held that the OPLA does not supercede common law product liability causes of action not directly addressed by the statute itself. *See Carrel,* 677 N.E.2d at 799–800. Accordingly, to the extent Plaintiffs' strict product liability claim presents a product liability cause of action against corporate Defendants outside the scope of the OPLA, it follows that local Defendants are not protected by § 2307.78(B). The Court need not determine the full contours of Plaintiffs' strict liability claim, for it is enough for the moment to find that local Defendants can be found liable for their own acts of negligence, including a failure to warn.[20]

Indeed, even the *Rezulin* court acknowledged that there is support for holding pharmacies liable when they have engaged in their own negligent acts. 133 F.Supp.2d at 289–90 (citing *Dooley v. Everett,* 805 S.W.2d 380 (Tenn.Ct.App.1990); *Riff v. Morgan Pharmacy,* 353 Pa.Super. 21, 508 A.2d 1247 (1986); *Lasley v. Shrake's Country Club Pharmacy, Inc.,* 179 Ariz. 583, 880 P.2d 1129 (1994); *Horner v. Spalitto,* 1 S.W.3d 519 (Mo.Ct.App. 1999)). Cases cited by Plaintiffs at pages 9 and 10 of their brief also stand for this proposition. *See Kerr v. Clason,* 1862 WL 1901, 2 Ohio Dec. 666 (1862); *Edelstein v. Cook,* 108 Ohio St. 346, 140 N.E. 765 (1923); *Flandermeyer v. Cooper,* 85 Ohio St. 327, 98 N.E. 102 (1912). Whether it is a failure to warn or an independent act of negligence, Plaintiffs' pleadings adequately state a colorable cause of action for negligence against local Defendants. If the law of Ohio is such that pharmacies are not to be held amenable to suit under the given circumstances, it should be for the courts of Ohio to say.

Because a colorable cause of action has been pled against local Defendants, diversity does not exist such that removal is proper under 28 U.S.C. §§ 1441 & 1332.

### B. *Federal Question and Artful Pleading*

Next, the Court takes up the question of whether it has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants the Court jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States" (commonly referred to as "federal question" jurisdiction). Defendants present two arguments for why the Court should recognize the existence of federal question jurisdiction in this case. *First,* they assert that Plaintiffs' Amended Complaint "states a federal question on its face" (Doc. # 1 at 10), notwithstanding the fact that, when read literally, the Amended Complaint is confined to state law causes of action. *Second,* they assert that the subject matter at issue is so completely governed by federal law and regulations, in particular the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA"), the Controlled Substances Act, 21 U.S.C. §§ 801–904 ("CSA"), and the auxiliary regulations promulgated pursuant thereunder, that any common law causes of action related thereto are preempted by the federal statutory scheme, such that the subject matter is triable only in federal court.

Underlying both arguments is the general premise that if Defendants are penalized, by the granting of the damages Plaintiffs seek, the acting court's actions will have the effect of overriding a comprehensive drug manufacturing, labeling, and distribution process that has already gained the approval of the FDA. Because of this,

---

**20.** Likewise, the extent to which § 2307.78 affects Plaintiffs' remaining claims, in particular their claims for breach of warranty, need

not be decided herein, and can be left for the state court to decide on a motion to dismiss or for summary judgment.

Defendants argue, the matter is one arising under federal law. (Doc. #23 at 11 & n. 20.) The respective arguments raised by Defendants represent two distinct doctrines providing means for removal even where a complaint states only state law claims on its face, the first being the "substantial federal question" doctrine, and the second being the "complete preemption" doctrine. *See* Arthur R. Miller, *Artful Pleading: A Doctrine in Search of Definition*, 76 Tex.L.Rev. 1781, 1784 (1998). The Court will examine the law of each doctrine, and then discuss Defendants' arguments.

1. *Exceptions to the Well–Pleaded Complaint Doctrine*

 Generally, under the well-pleaded complaint doctrine, whether a federal question is presented can be discerned from the face of the plaintiff's complaint. If it states a federal question, so be it; if it does not, then there is none, notwithstanding the fact that a federal question surely will arise by virtue of an anticipated defense invoking the United States Constitution or federal law. *See Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Gully v. First National Bank*, 299 U.S. 109, 112–113, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Franchise Tax Bd. of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 U.S. 1, 12, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)(holding that it makes no difference that both parties concede that the only material issue is that raised by the federal defense). The fact that a state cause of action may be preempted by federal law will usually only provide a defendant with a defense. Preemption in and of itself is not a ticket to remove the state action to federal court. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

 On the other hand, where a plaintiff "artfully pleads" a state claim, in some circumstances a district court may uphold removal even though no federal question appears on the face of the complaint. *See Rivet v. Regions Bank of La.*, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998). As noted by Professor Miller, there have arisen in the case law two exceptions to the well-pleaded complaint rule. Under one exception, the Supreme Court has held that a state law cause of action actually arises under federal law "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Board*, 463 U.S. at 9, 103 S.Ct. 2841 (citation omitted). This sentiment represents what has been called the "substantial federal question" doctrine. *See* Miller, *supra* at 1784. This doctrine traces its roots to *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), and is based on the theory that "[e]ven though state law creates [a plaintiff's] cause of action, its case still might 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Board*, 463 U.S. at 13, 103 S.Ct. 2841.

*Smith* itself was not a removal case. A Bill for an Injunction was filed in district court, in which plaintiff alleged that defendant's actions were illegal because they were pursued by authority of a federal statute, which itself, it was argued, was unconstitutional. There was no averment that defendant's actions violated any other federal law, and thus, absent the constitutional question, there would not have been jurisdiction. Considering the issue of subject matter jurisdiction *sua sponte*, 255

U.S. at 199, 41 S.Ct. 243, the Court concluded that because the legality of defendant's actions turned on the constitutionality of the federal statute pursuant to which it performed, plaintiff's Bill for Injunctive Relief stated a federal question. *Id.* at 202, 41 S.Ct. 243. Based on *Smith,* it has been stated in the subsequent case history that removal is warranted where a right created by Congress or the Constitution is a *material* element of the plaintiff's claim. *See Gully,* 299 U.S. at 112, 57 S.Ct. 96 (citation omitted)(emphasis added).

A second exception to the well-pleaded complaint rule has developed, and holds that a plaintiff may not forgo a clear federal cause of action, and thus avoid federal jurisdiction, by "artfully pleading" its claim as one arising under state law. *See Rivet,* 522 U.S. at 475, 118 S.Ct. 921; *Franchise Tax Board.,* 463 U.S. at 22, 103 S.Ct. 2841. "One corollary of the well-pleaded complaint rule developed in the case law ... is that Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life,* 481 U.S. at 64, 107 S.Ct. 1542. Thus, unlike the substantial federal question doctrine, the complete preemption doctrine requires more than the mere presence of a federal question. Its invocation turns on the availability of a federal cause of action so sweeping in nature that it completely does away with any state cause of action.

The complete preemption doctrine has been invoked by the Supreme Court in only two circumstances. In *Avco Corp. v. Aero Lodge 735 Int'l Assoc. of Machinists & Aerospace Workers,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), the Su-

preme Court addressed the nature of a state law claim that was, for all intents and purposes, identical to one actionable under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 301 specifies that suits for violations of contracts between an employer and a collective bargaining organization, or between the collective bargaining organizations themselves, are actionable in federal district court. 29 U.S.C. § 185(a). Pursuant to a "no-strike" clause in their collective bargaining agreement, the employer plaintiff in *Avco* filed a suit in state court to enjoin employee defendants from striking. The Supreme Court found that this was no different from a suit brought under § 301, and held that it was inherently federal in nature (by virtue of Congress' intent to completely preempt), and that removal was proper.

*Metropolitan Life* is essentially *Avco* redux, the only difference being that the federal provision at issue therein was § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Previously, in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), decided on the same day as *Metropolitan Life,* the Court had held that state law claims arising under tort and contract for alleged improper administration of employee benefit funds are preempted by ERISA. The court noted the language of section 514(a) of that Act, 29 U.S.C. § 1144(a), which states that "this subchapter and subchapter III of this chapter shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 481 U.S. at 44–45, 107 S.Ct. 1549.[21] *Pilot Life* was a diversi-

---

**21.** The Court also cited the Conference Report which stated that *"[a]ll such actions in Federal or State courts are to be regarded as arising under the laws of the United States in* *similar fashion to those brought under section 301 of the [LMRA]."* 481 U.S. at 55, 107 S.Ct. 1549 (citing H.R. Conf. Rep. No. 93–1280, at 327 (1974))(emphasis in original).

ty suit, therefore the Court had no need to consider the removal force of ERISA. In *Metropolitan Life*, the Court simply finished its business. It held that Congress had made clear that, as with § 301 of the LMRA, "any action" that could be filed pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B),[22] "arises under" federal law, and is removable. 481 U.S. at 65–66, 107 S.Ct. 1542.

▮▮▮▮ *Of vital importance* is understanding that removal jurisdiction in this type of situation does not rest upon a finding that the state claims are preempted, but upon a finding that *Congress clearly intended for removal jurisdiction to be available. See id.* at 66, 107 S.Ct. 1542 ("[E]ven an 'obvious' preemption defense, does not, in most cases, create removal jurisdiction."); *see also id.* at 67–68, 107 S.Ct. 1542 (Brennan, J., concurring)(noting that "congressional intent to preempt" is not enough to justify removal; only a finding that "Congress has *clearly* manifested an intent to make causes of action … *removable to federal court*" will justify taking jurisdiction on a removal basis)(emphasis in original).[23]

As limited in its applicability as the complete preemption doctrine seems to be, the current applicability of the substantial federal question doctrine has been called into greater question. For example, two circuits have held that complete preemption is the only exception to the well-pleaded complaint rule. *See Waste Control Specialists, L.L.C. v. Envirocare of Texas, Inc.*, 199 F.3d 781, 783 (5th Cir.2000)(stating that without a finding of complete pre-

emption, there can be no other way around the well-pleaded complaint rule), *superceded in unrelated part by* 207 F.3d 225 (5th Cir.2000); *M. Nahas & Co., Inc. v. First Nat'l Bank of Hot Springs*, 930 F.2d 608, 612 (8th Cir.1991)(same). District courts have followed. *See, e.g., Indeck Maine Energy, L.L.C. v. ISO New England, Inc.*, 167 F.Supp.2d 675 (D.Del.2001); *see also Miller, supra* at 1793, n. 79 (citing district court decisions from within the Eighth Circuit following the reasoning of *Nahas, supra*, that complete preemption is the only exception to the well-pleaded complaint rule). *But see Ayres v. General Motors Corp.*, 234 F.3d 514, 518–19 (11th Cir.2000) (holding that removal was proper where plaintiff's success on the state causes of action would necessarily turn on successfully proving the commission of federal crimes); *In re Wireless Tel. Radio Frequency Emissions Prods. Liability*, 216 F.Supp.2d 474, 493–93 (D.Md.2002) (opining that complete preemption is one, but not the only, doctrine that comes within the larger artful pleading doctrine).

Contemporary decisions from the Supreme Court have fueled the question of whether the substantial federal question doctrine retains any vitality, casting a long shadow over the doctrine's effectiveness, if not altogether obliterating it. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), provides the best evidence of this. Therein, plaintiffs alleged in state court that the pharmaceutical company defendant had misbranded its labels in violation of the FDCA, proof of which was

---

**22.** That statute provides an employee with a federal forum to recover benefits due to him, enforce his rights guaranteed to him, and clarify his rights, under the plan.

**23.** As the Seventh Circuit has aptly noted, "complete preemption" is not true preemption, such that a cause of action under a

conflicting state law is barred, but is, rather, a rule of federal jurisdiction. *Lister v. Stark*, 890 F.2d 941, 944, n. 1 (7th Cir.1989). "This 'complete preemption' exception permits recharacterization of a plaintiff's state-law claim to a federal claim so that removal is proper." *Id.* at 943.

integral to their claims for negligence, breach of warranty, strict liability, and fraud. Finding that there was no expressed or implied cause of action within the FDCA itself, *id.* at 810–812, 106 S.Ct. 3229, the Court held that it would "flout, or at least undermine, congressional intent to conclude that the federal courts might nevertheless exercise federal question jurisdiction" over state law claims which merely include violations of the federal statute as part of the allegations giving rise to the state cause of action. *Id.* at 812, 106 S.Ct. 3229. The fact that Congress omitted a private right of action is "tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." *Id.* at 814, 106 S.Ct. 3229.

A year later, in *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), the Court referred to the "complete preemption" doctrine as *the* exception to the well-pleaded complaint rule. Such sentiment was echoed more recently in *Rivet*, 522 U.S. at 475, 118 S.Ct. 921, wherein the Court, in laying out the basic legal tenets of this area of law, stated that "[t]he artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim," again making no mention of a separate substantial federal question doctrine.

Even *Franchise Tax Board*, though cited by Defendants for its recognition of the *Smith* principle that a substantial federal question in a state cause of action provides federal jurisdiction, more readily illustrates the fragility of the doctrine than its potency. Therein, the Court addressed the question of whether removal was proper where the underlying question presented was whether a state could levy ERISA-covered employee vacation trust funds for purposes of collecting unpaid state taxes. 463 U.S. at 3–4, 103 S.Ct. 2841. One claim was for an order enforcing the levy; a second was for a declaratory judgment that such an action was proper. With respect to the first question, the Court distinguished the state law question of whether there was a *state right* to enforce the levy from the federal law question of whether ERISA provisions trumped that state right. A finding with respect to the latter question would only be relevant (for defensive purposes) after making a finding with respect to the former. As such, it was the former question which controlled, and that question arose under state, not federal, law. *See id.* at 13–14, 103 S.Ct. 2841.

The Court found greater difficulty with the declaratory judgment claim, for a declaration that the plaintiff was entitled to enforce its levy would necessarily require the trial court to construe ERISA. *Id.* at 14, 103 S.Ct. 2841. Despite the "difficult problem" presented by the question, the Court held that where a plaintiff seeks a declaration of its *rights under state law*, the fact that a federal question will necessarily be addressed by the court does not give rise to a claim "arising under" federal law, and federal district courts would lack jurisdiction either by way of removal, or by way of original federal question jurisdiction (were the action to be brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201). *Id.* at 19–22, 103 S.Ct. 2841.

Despite the rather shaky ground on which the substantial federal question doctrine now rests, in a case decided during the same term as that in which *Rivet* was decided, the Supreme Court, citing *Franchise Tax Board*, recognized the doctrine's historical existence alongside that of the complete preemption doctrine. *See Chica-*

*go v. International College of Surgeons,* 522 U.S. 156, 164, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). On the basis of *Chicago,* and another case dealing with substantial questions of patent law, *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), the Sixth Circuit recently recognized the availability, if not necessarily the potency, of the substantial federal question doctrine in *Long v. Bando Mfg. of America, Inc.,* 201 F.3d 754, 759–61 (6th Cir. 2000).

Importantly, however, neither *Chicago* nor Christianson circumscribed the significant limitation placed on the substantial federal question doctrine by *Merrell Dow.* The *Merrell Dow* Court, having found no right of action provided in the statute there at issue (the FDCA), stated that "[t]he significance of the necessary assumption that there is no federal private cause of action thus cannot be overstated." 478 U.S. at 812, 106 S.Ct. 3229. Given Congress' own decision not to provide a cause of action, "the presence of the federal issue as an element of the state tort is not the kind of adjudication for which jurisdiction would serve congressional purposes and the federal system." *Id.* at 814, 106 S.Ct. 3229. With respect to the federal question presented in *Chicago,* it was, in fact, an affirmative federal constitutional claim which just so happened to be brought pursuant to a state statute providing a cause of action for such. 522 U.S. at 164, 118 S.Ct. 523. Thus, the holding that removal therein was appropriate is quite unremarkable, and the citation to *Franchise Tax Board* likely superfluous. For its part, Christianson did not even involve removal, and the Court merely looked to its statements regarding substantial federal question for analytical purposes in analyzing whether an antitrust action involved a substantial question of *patent* law, which would thereby allow the Federal Circuit to

take jurisdiction over the appeal from the district court. 486 U.S. at 809, 108 S.Ct. 2166.

A perusal of the contemporary Supreme Court case law thus reveals more examples of when and why *not to* allow removal on substantial federal question grounds than it does examples of when and why *to* allow such. About the only attempt to reconcile the conflict between the doctrine engendered by *Smith* and those cases adhering to the sanctity of the well-pleaded complaint came in footnote 12 of *Merrell Dow.* Therein, the Supreme Court made a half-hearted gesture to clarify the discontinuity by noting the "importance" in *Smith* of the statute's constitutionality to the plaintiff's claim, as compared to federal questions raised by complaints in other cases which do not "fundamentally change the state tort nature of the action." 478 U.S. at 814, n. 12, 106 S.Ct. 3229. Still, *Smith* stands alone among Supreme Court cases as a successful example of the doctrine it engendered. At least with respect to federal *statutory* defenses, whatever is left of the doctrine is limited by *Merrell Dow,* which requires, as with the complete preemption doctrine, a showing that Congress has created a cause of action of which the plaintiff may avail herself before a federal court may assume removal jurisdiction based on a federal question not actually pled by plaintiff.

### 2. *Analysis*

▆▆ In light of the state of the law of both the substantial federal question doctrine and the complete preemption doctrine, Defendants' arguments are ineffective. As the Court's review indicates, removal would be proper only if the FDCA or the CSA, the federal statute's which Defendants argue preclude Plaintiffs' right to the remedies they seek, created the rights which Plaintiffs seek

858

to vindicate and the remedy by which they may do so. Defendants' argument fails to persuade, because it fails to offer any indication that Congress intended, let alone *clearly intended,* for removal jurisdiction to be available to parties defending against common law claims, the success of which arguably requires the consideration of the FDCA and/or the CSA. It is not enough to merely argue, as Defendants do, that Congress intended to preempt state law claims touching on matters of pharmaceutical regulation.[24]

■ Plaintiffs have set forth allegations that certain of their rights arising under the laws of the State of Ohio have been violated. In response, Defendants cite to the regulatory scheme governing the manufacture, labeling, and distribution and the like of pharmaceuticals, and claim that Plaintiffs cannot achieve the remedies they seek without overriding the federal regulatory system. They contend that "the only means available [to Plaintiffs] to achieve their ends is provided by federal law." (Doc. # 23 at 13.) If Defendants intend to say that the only way Plaintiffs can prove the elements of their various

claims is by proving that they were deprived of a federal right, they are wrong. State law provides Plaintiffs their rights, and if they can meet the elements thereunder, then they have their success, barring a successful defense. The merits of their claims can be decided by looking solely to the common law and statutes of Ohio, and they do not need to rely upon federal law.[25] If Defendants intend to say that the relief Plaintiffs seek pursuant to their state law claims is not available to them because the supreme law of the federal government has supplanted such, then they may be right, but that argument merely presents a federal defense to be raised in state court. *See, e.g., Franchise Tax Board,* 463 U.S. at 13, 103 S.Ct. 2841 ("California law establishes a set of conditions, without reference to federal law, under which a tax levy may be enforced; federal law becomes relevant only by way of a defense to an obligation created entirely by state law, and then only if appellant has made out a valid claim for relief under state law."). The imposition of a federal question embedded in a defense does not itself raise a substantial federal question justifying removal.[26] *See*

24. Defendants rely on *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), for support. The *Cipollone* Court recognized that common law damages actions can have the effect of restraining or prohibiting certain future conduct in the same way actual injunctive relief would. *Id.* at 521–22, 112 S.Ct. 2608. This is so because faced with future damages actions against it, a defendant will likely conform future conduct within whatever rule he had been found to have violated. The same result may indeed be warranted in this case, but this merely raises the possibility of preemption, an irrelevant consideration at the moment. *Cippollene,* as helpful to Defendants as it may turn out to be in a motion to dismiss or for summary judgment, was a diversity case and is not helpful here, as the Court was not called upon to address issues related to removal. For the same reasons, *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d

700 (1996), cited for support by Plaintiffs, is not helpful. Although involving removal based on "complete preemption," the Court focused exclusively on a preemption analysis, and not on the more narrow question of whether the case was properly removed.

25. As made clear by *Merrell Dow,* that Plaintiffs may raise certain federal law violations in stating their state causes of action does not make them inherently federal. 478 U.S. at 814, 106 S.Ct. 3229. Additionally, under a *Merrell Dow* footnote 12 analysis, it is clear that the federal questions posed by Defendants do not "fundamentally change the state tort nature" of Plaintiffs' claims.

26. On the other hand, the merits of a traditional preemption defense may be reviewed by the Supreme Court on appeal from the state appellate court. *See Merrell Dow,* 478 U.S. at 816 n. 14, 106 S.Ct. 3229; *Franchise*

*Caterpillar,* 482 U.S. at 399, 107 S.Ct. 2425.

*Kaucky v. Southwest Airlines Co.,* 109 F.3d 349 (7th Cir.1997), relied upon by Defendants for support, teaches nothing to the contrary. *Kaucky* concerned a common law suit for conversion and breach of contract, arising out of an airline's collection of an air transportation excise tax which was, arguably, wrongly collected. Finding that the airline acted in good faith in collecting the tax, the Seventh Circuit held that the suit was actually one for a refund of a federal tax and necessarily arose under federal law, and was therefore removable. *Id.* at 351–53. Importantly, the court found that Congress had *provided a remedy* for such taxpayers, and that filing a claim against the government for a refund was a prerequisite for filing suit. *Id.* at 350 (citing 26 U.S.C. § 7422(a)).

*Kaucky* is illustrative of what it takes to show that a state law claim necessarily involves proving rights under federal law, and the implicit intent of Congress to make such actions removable. Essentially, the backbone of any successful removal action based on federal question jurisdiction is a finding that the entire state *cause of action* has been replaced by a federal cause of action. Such a finding is the common denominator in *Kaucky* and the controlling Supreme Court cases, *Avco, Franchise Tax Board, Merrell Dow,* and *Metropolitan Life,* as discussed above. In light of these Supreme Court decisions, the Seventh Circuit's decision in *Kaucky* takes its proper place within the doctrinal framework.

Defendants' attempts to characterize the administrative procedures available to Plaintiffs to contest the FDA's regulation of OxyContin labeling as a comprehensive substitute for their state causes of action,

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq.,* are not persuasive. The APA is available to contest agency actions. Despite Defendants' attempts to color Plaintiffs' claims as ones seeking only to overturn prior FDA decisions related to OxyContin, this action is not one against the FDA, or any other agency. This action is one against private parties for damages, and Defendants have not pointed to, because they do not exist, remedies within the FDCA and CSA which provide Plaintiffs opportunity for relief similar to that provided by § 301 of the LMRA or § 502 of ERISA.

Defendants make a final plea for removal on the federal question basis, arguing that there is a need for national uniformity in the interpretation of the FDCA and the CSA. This argument is equally unavailing, knocked out on all fours by the holding in *Merrell Dow,* wherein the Court remarked, with respect to the FDCA:

> Petitioner's concern about the uniformity of interpretation, moreover, is considerably mitigated by the fact that, even if there is no original district court jurisdiction for these kinds of action, this Court retains power to review the decision of a federal issue in a state cause of action.

478 U.S. at 816, 106 S.Ct. 3229.

If this were a suit merely to enjoin corporate Defendants from continuing to use its current OxyContin label and to seek a court-supervised revamping of the manufacturing, labeling, and distribution process already sanctioned by the FDA, then the Court would be more inclined to view the cause of action as encompassing nothing more than that which the administrative action provides. *See* 21 C.F.R. § 10.30 (2001)(providing for "citizen peti-

*Tax Board,* 463 U.S. at 12, n. 12, 103 S.Ct. 2841. In any event, if Defendants' preemp-

tion defense is meritorious, it would be no less so in state court than in federal.

tions" to contest FDA actions).[27] That, though, is not what Plaintiffs seek. (*See supra* note 5.) Any federal questions which may exist are either defensive in nature or subsidiary to the state law questions, and the damages Plaintiffs seek do not implicate a "central concern" of the FDCA or CSA. *See Franchise Tax Board*, 463 U.S. at 25–26, 103 S.Ct. 2841. Federal law may be effective to Defendants as a shield to liability, but, under the circumstances, it does not provide Plaintiffs with a sword of their own to prosecute their claims, as federal claims, in federal court.

As state law provides the only affirmative means by which Plaintiffs may seek their relief for damages, the state court is the proper forum,[28] absent diversity jurisdiction, and removal is not proper under 28 U.S.C. §§ 1441 & 1331.

### C. Whether Corporate Defendants Are de facto "Federal Officers"

▆ In their opposition brief (Doc. # 24), Abbott Defendants present a third question: Given the highly regulated nature of the pharmaceutical industry, should pharmaceutical manufacturers be regarded as *de facto* federal officers such that they may remove pursuant to 28 U.S.C. § 1442(a)(1)? That statute provides a basis for removal in a civil action to "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office...." 28 U.S.C.A. § 1442(a)(1) (West Supp.2001). Defendants do not cite

to any Sixth Circuit decisions on this topic, or to those of any of the Court's sister districts within the circuit. For their support, Defendants cite to a number of other district or circuit court decisions.

▆ For § 1442(a)(1) to be effective, the entity claiming "officer" status must be able to show that he has a colorable federal defense (i.e., that he did the acts of which he is accused in response to a directive originating from federal authority). *See Mesa v. California*, 489 U.S. 121, 129, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). Also, "[t]here must be a causal connection between what the officer has done under asserted official authority" and the harm complained of in the state action. *Maryland v. Soper*, 270 U.S. 9, 33, 46 S.Ct. 185, 70 L.Ed. 449 (1926). This particular removal provision secures the efficient execution of federal laws and prevents "interference therewith, due to possible local prejudice, by state prosecutions instituted against federal officers in enforcing such laws." *Id.* at 32, 46 S.Ct. 185. The Court has no question that corporate Defendants have a colorable federal defense. The only issue is whether they were acting at the direction of a federal officer.

Abbot Defendants contend that "courts have repeatedly held that any person or entity subject to 'complex regulations, guidelines and evaluation schemes' qualifies for federal officer removal." (Doc. # 24 at 1 (quoting *Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.*, 358 F.Supp. 841, 844 (S.D.N.Y.1973)).) However, a look at the facts of the cases

---

**27.** Of course, such a scenario would raise an entirely new issue concerning the applicability of the "primary jurisdiction" doctrine. *See, e.g., Bernhardt v. Pfizer, Inc.*, 2000 WL 1738645 (S.D.N.Y. Nov. 22, 2000).

**28.** Nothing herein should be read by the parties as a suggestion that any part of Plaintiffs' claim is not preempted by federal law. The

Court has addressed only the question of whether the claim is so completely preempted that it must be construed as a claim arising under federal law, thus allowing it to be removed. Whether traditional preemption is available as a defense is of no immediate concern.

cited by Defendants reveals a body of law which does not support their position. The defendant in *Gurda* was a legal aid organization organized under federal law which operated at the direction of, and with funding from, the federal Office of Equal Opportunity. *Id.* at 842–45. The defendant was much more than merely "subject to complex regulations"; it operated at the discretion of federal authorities. Corporate Defendants herein do not operate at the discretion of federal authorities. They are private, for-profit business organizations which exist independently of the federal government. Lest participants in every regulated industry be entitled to "federal officer" status, corporate Defendants need to make a much greater showing that in doing the acts giving rise to Plaintiffs' claims, they were acting pursuant to a federal directive. Acting under the watchful eye of the federal government is not enough.

*Pack v. AC and S., Inc.*, 838 F.Supp. 1099 (D.Md.1993), also cited by Defendants, is of no help. Therein, the defendant, Westinghouse Electric Corporation ("Westinghouse"), was operating pursuant a government contract with the U.S. Navy and Marine Commission for the manufacture of turbine generators. *Id.* at 1103. The court found that federal officers had "extensive control over the construction, design, and testing of the turbines." *Id.* "Indeed, the government would specify and approve the type of asbestos cloth to be used when insulating valves and flanges. It monitored Westinghouse's performance and on occasion it returned drawings and specifications for revision. After installation of the turbines aboard a ship, the government performed sea trials, and reviewed and approves the results." *Id.*

Abbott Defendants reference the facts as stated in Purdue Defendants' brief to establish that similarly comprehensive regulation takes place in the pharmaceutical business. The Court is not moved by Abbott Defendants' argument. Purdue Defendants' brief says little more on this point than that the pharmaceutical industry is heavily regulated. (*See, e.g.,* Doc. # 23 at 10.) The Court acknowledges the presence of federal oversight in the industry. For example, it notes that the section regulating the introduction of new drugs, 21 U.S.C. § 355, vests significant authority in the Secretary of Health and Human Services to oversee clinical trials establishing the effects of proposed drugs (paragraph (b)(1)), to deny the introduction of new drugs (subsection (d)), and to conduct hearings on the safety of proposed drugs (subparagraph (c)(1)(B)). Nonetheless, neither Abbott nor Purdue Defendants has demonstrated, or even suggested, that the involvement of the FDA in the day-to-day drug development and manufacturing process is as involved as that of the government officers in *Pack*. The difference, the Court finds, is that whereas the defendants in *Pack* were operating under the terms of a federal contract, and thus the *operative contractual commands* of federal officials, corporate Defendants herein are operating at their own initiative. Drug manufacturers do not take governmental orders (or follow commands).[29] True, their acts must conform to federal regulations, but *they are under no duty, or direction, to act.* The defendants in *Pack* and *Gurda*, on the other hand, had their respective duties to act; they were *directed* to do what they did. Removal was permissible because the acts complained of were those in furtherance of such *federal duties.*

---

**29.** There is no suggestion that corporate Defendants brought OxyContin to market pursuant to a government contract.

Regarding the other cases cited by Defendants, the Court notes that in *Fung v. Abex Corp.*, 816 F.Supp. 569 (N.D.Cal. 1992), the defendant's allegedly tortious acts concerned its manufacture of Navy submarines pursuant to a federal contract. *Holton v. Blue Cross and Blue Shield of South Carolina*, 56 F.Supp.2d 1347 (M.D.Ala.1999), also concerned a federal contract. Therein, the defendant seeking removal was acting pursuant to its own contract with a government contractor, or, in the words of the court, as a "fiscal intermediary." *Id.* at 1350. Whatever its status, its actions were compelled by the federal contract, the terms of which were dictated by federal statute. *Id.* at 1351. In *Texas v. National Bank of Commerce of San Antonio*, 290 F.2d 229 (5th Cir. 1961), defendant was a limited-service bank which operated on a federal military installation. The Court found that it was both an agent of the United States itself, in that it served as a federal bank depository, and that it operated under the direction of the Secretary of the Treasury, a federal officer. *Id.* The defendant in *Teague v. Grand River Dam Authority*, 279 F.Supp. 703, 704 (N.D.Okla.1968), engaged in the allegedly tortious act of opening its dam flood gates under orders from the U.S. Corp of Engineers, "the authorized representative of the Secretary of Army." Finally, *Dixon v. Georgia Indigent Legal Services, Inc.*, 388 F.Supp. 1156 (S.D.Ga. 1974), involving federally funded legal aid organizations, is a carbon copy of *Gurda*, and it was on the precedent of the earlier case that the court found the legal aid providers to be operating under the direction of a federal officer.

As a matter of fact, corporate Defendants have neither shown nor suggested that their actions of which Plaintiffs complain were undertaken at the behest of a federal officer. Stated simply, they were not directed to act, either by law or by contract; they did so of their own volition. Accordingly, the integrity of the federal sovereign is not compromised by suit against them in state court.

### III. Conclusion

Based on the reasoning and citation of authority set forth above, having found that Plaintiffs state colorable claims against local Defendants, and that none of the stated causes of action have been completely preempted by federal law or involve a substantial federal question, the Court finds that removal was improvidently undertaken. For those reasons, Plaintiffs' Motion to Remand (Doc. # 16) is well taken, and it is hereby SUSTAINED.

Accordingly, Plaintiffs' action is remanded to the Common Pleas Court of Montgomery County, Ohio, pursuant to 28 U.S.C. § 1447(c).

As a final, parenthetical matter, the Court notes that it need not address Defendants' separately filed Motion to Strike Class Allegations (Doc. # 27). Said Motion shall remain pending for the Common Pleas Court's consideration.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.